KYLE SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax

Attorneys for Plaintiff
Stephanie M. Dodson

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON – EUGENE DIVISION

| | |
|---|---|
| Stephanie M. Dodson**,**<br><br>           Plaintiff,<br><br>     v.<br><br>Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC; Great Lakes Educational Loan Services, Inc.; Credit Acceptance Corporation; Oregon State University;  and DOES 1 through 100 inclusive,<br><br>           Defendants. | CASE NO. 6:21-cv-00029<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>1.  Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **STEPHANIE M. DODSON** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

### INTRODUCTION

1.     This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2.     Defendant Credit Acceptance Corporation ("CAC") is reporting multiple, monthly repossessions on a single account.

//

//

3. Defendant Great Lakes Educational Loan Services, Inc. ("Great Lakes"), as a loan servicer, and Defendant Oregon State University ("OSU"), as a lender/servicer, are reporting Plaintiff's accounts inaccurately.

4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. Creditors intentionally and routinely ignore industry standards for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

6. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

7. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

9. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

10. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

11. Plaintiff alleges that her vehicle subject to the note held by CAC was repossessed in or about May of 2019.

12. Plaintiff alleges that a "R" or repossession is a one-time event, and as a single vehicle secured by a single debt cannot be repossessed repeatedly, the debt cannot report multiple, repeated repossessions.

13. Plaintiff alleges that the Great Lakes accounts and OSU accounts are closed due to transfer, and as such, are not currently past due.

//

14. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

15. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

16. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

17. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

18. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   FICO, Inc.**

19. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

20. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

21. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

22. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

23. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

24. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

25. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

26. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

27. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

28. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

29. Each of the five (5) factors is weighted differently by FICO.

30. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

31. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

32. Repeated derogatory payment history increases the recency and frequency calculation; therefore, repeated negative items in the payment history is more sever and detrimental to a FICO Score.

33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

36. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same

level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

**B.    Metro 2**

37.    The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

38.    The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

39.    The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness*.

40.    The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

41.    The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.    The CDIA offers a FCRA certificate program for all CRAs.

    b.    The CDIA offers a FCRA awareness program for all CRAs.

    c.    The CDIA offers a FCRA certificate program for DFs.

    d.    The CDIA offers a FCRA awareness program for DFs.

    e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

    f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.    The CDIA developed a credit reporting resource guide for accurately reporting credit.

42.    The CDIA's Metro 2 format is accepted by all CRAs.

43. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

44. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2 format.

45. The CRRG is not readily available to the public. It can be purchased for $229.45.

46. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will <u>not</u> grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.    e-OSCAR**

50. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

51. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

52. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.    Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

53. On October 22, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "October 22 Credit Reports").

54. Plaintiff noticed adverse tradelines in her October 22 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

55. Plaintiff then disputed the inaccurate tradelines via certified mail to Experian, Equifax, and TransUnion on or about November 16, 2020 (the "Dispute Letters").

56. In regard to the Equifax credit report, Plaintiff's Dispute Letter specifically put Great Lakes and OSU on notice that Plaintiff's credit report was inaccurately reporting as past due and that Plaintiff's account should be updated.

57. In regard to the Experian credit report, Plaintiff's Dispute Letter specifically put CAC on notice that Plaintiff filed for bankruptcy, received a bankruptcy discharge, and that Plaintiff's account should be updated post discharge to remove the repeated, monthly charge offs.

58. In regard to the TransUnion credit report, Plaintiff's Dispute Letter specifically put Great Lakes and OSU on notice that Plaintiff's credit report was inaccurately reporting as past due and that Plaintiff's account should be updated.

59. Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

60. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

61. Plaintiff is informed and believes that Experian, Equifax, and TransUnion each received Plaintiff's Dispute Letters and, in response, sent Plaintiff's dispute to Great Lakes, OSU, and CAC, as the data furnishers, via an ACDV through e-OSCAR.

62. On December 30, 2020, Plaintiff ordered a second three-bureau credit report from Experian to determine if her accounts were updated.

    a. **Inaccuracy – CAC Account**

63. Despite actual knowledge, Defendant CAC continued to inaccurately report Plaintiff's account, beginning in 864354xx, to Experian by deleting the rolling charge offs and replacing it with a "R" for repossession for each month from May of 2019 through May of 2020. This payment history is inaccurate as a single debt (covering a single vehicle) can only be repossessed one time and not recurring on a monthly basis.

64. CAC did not update the tradeline to remove the inaccuracies but instead continued to inaccurately report the account by way of multiple repossessions.

65. Experian provided notice to CAC that Plaintiff was disputing the inaccurate and misleading information, but CAC failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

66. Plaintiff alleges that CAC did not review well-established industry standards for credit reporting.

67. If CAC reviewed such standards, CAC would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

68. By reporting Plaintiff's account with a "R" for repossession for each month from May of 2019 through May of 2020, it is compounding the derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

69. The only time that CAC can report the repossession should have been for the month the vehicle repossession actual took place; however, CAC reported a monthly repossession for thirteen (13) straight months. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and her ability to obtain new credit.

70. CAC's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

### b. Inaccuracy – Great Lakes

71. Despite actual knowledge, Defendant Great Lakes continued to report Plaintiff's account, beginning in 931079xxxx, to Equifax with a current payment status of "At least 120 days or more than four payments past due", even though the account is closed, has a zero balance, and was transferred in August of 2015.

72. Despite actual knowledge, Defendant Great Lakes continued to report Plaintiff's account, beginning in 931079xxxx, to TransUnion with a current payment status of "120 days past due", even though the account is closed, has a zero balance, and was transferred in August of 2015.

73. Equifax and TransUnion both provided notice to Great Lakes that Plaintiff was disputing the inaccurate and misleading information, but Great Lakes failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

74. Plaintiff alleges that Great Lakes did not review well-established industry standards for credit reporting.

75. If Great Lakes reviewed such standards, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

//
//

76. By continuing to report Plaintiff's account to Equifax as described in paragraph 71, and to TransUnion as described in paragraph 72, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on her payments, which in inaccurate.

77. The lack of investigation by Great Lakes is unreasonable.

**c.    Inaccuracy – OSU**

78. Despite actual knowledge, Defendant OSU continued to report Plaintiff's account, beginning in C5A916xxxxxxxxxxxxxxx, to Equifax with a current payment status of "At least 120 days or more than four payments past due", even though the account is closed, has a zero balance, and was transferred.

79. Despite actual knowledge, Defendant OSU continued to report Plaintiff's account, beginning in A916E2xxxxxxxxxxxx, to TransUnion with a current payment status of "120 days past due", even though the account is closed, has a zero balance, and was transferred.

80. Equifax and TransUnion both provided notice to OSU that Plaintiff was disputing the inaccurate and misleading information, but OSU failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

81. Plaintiff alleges that OSU did not review well-established industry standards for credit reporting.

82. If OSU reviewed such standards, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

83. By continuing to report Plaintiff's account to Equifax as described in paragraph 78, and to TransUnion as described in paragraph 79, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on her payments, which in inaccurate.

84. The lack of investigation by OSU is unreasonable.

**E.    Damages**

85. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

86. As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiff's rights to accurate credit reporting as intended by Congress.

//

87. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect payment status reported by Defendants is effectively lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

88. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Defendants.

89. Defendant's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
### (Against Defendants and Does 1-100)

90. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Experian, Equifax, and TransUnion Failed to Assure Credit Reporting Accuracy**

91. Experian, Equifax, and TransUnion (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

92. Had Experian maintained reasonable procedures to assure maximum accuracy, it would never have never allowed CAC to report its account as described herein.

93. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would never have never allowed Great Lakes or OSU to report its account as described herein.

94. Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would never have never allowed Great Lakes or OSU to report its account as described herein.

95. Experian knew, or should have known, (1) that the CAC account could only be repossessed once as the same debt and/or vehicle cannot be repossessed each month on a continuous basis, and (2) that reporting a "R" for repossession month after month was increasing the frequency and recency of the derogatory reporting which was having a compounding, negative effect on Plaintiff's FICO Score. Further, Experian knew, or should have known, that this

inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

96. Equifax knew, or should have known, that the Great Lakes account should not have been reported as described in paragraph 71 and the OSU account should not have been reported as described in paragraph 78 since both the accounts are closed due to a transfer and have a zero balance. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

97. TransUnion knew, or should have known, that the Great Lakes account should not have been reported as described in paragraph 72 and the OSU account should not have been reported as described in paragraph 79 since both the accounts are closed due to a transfer and have a zero balance. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

98. As a result of the CRA Defendant's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

99. The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

100. The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

101. To the extent the CRA Defendants do send consumer disputes, the CRA Defendants send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

102. The CRA Defendants' employees receive little to no training concerning how to accurately report consumer debt.

//

103. Instead, the CRA Defendants' employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

104. The CRA Defendants' employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

105. The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

106. As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

107. The CRA Defendants' violations were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

108. In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

109. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

110. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     CAC, Great Lakes, and OSU Failed to Reinvestigate Following Plaintiff's Dispute**

111. Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

//
//

112. CAC, Great Lakes, and OSU each violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

113. Experian provided notice to CAC that Plaintiff was disputing the misleading, inaccurate, and incomplete information; however, CAC failed to conduct a reasonable investigation as required by the FCRA.

114. Based on Plaintiff's dispute, CAC should have known its account could not be repossessed multiple times on a monthly basis and ceased its inaccurate reporting. Further, CAC understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

115. A single debt covering a single vehicle can only be repossessed one time and, if a vehicle is repossessed, it should only be reported on the account for a single month in which the vehicle was actually repossessed. Once a vehicle is repossessed, the payment history reporting on that debt should cease (absent subsequent payment). As a single debt cannot be repossessed multiple times, reporting as such is patently incorrect.

116. This type of inaccurate reporting can also adversely affect credit decisions. Payment history (where the multiple "R" for repossession notations are being reported), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. If a repossession is repeated for months on end, it is increasing the frequency of derogatory payment history as well as the recency; both compounding to lower a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, CAC's reporting of multiple "R" for repossessions of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

117. CAC's lack of investigation, as required by the FCRA, is unreasonable.

118. TransUnion and Equifax both provided notice to Great Lakes and OSU that Plaintiff was disputing the inaccurate and misleading information; however, Great Lakes and OSU both failed to conduct a reasonable investigation as required by the FCRA.

119. Based on Plaintiff's dispute, Great Lakes and OSU should have known its respective accounts were closed with a zero balance on account of the transfer, and ceased its inaccurate reporting of a currently past due statuses.

120. As an account which has been transferred and has a zero balance cannot also be currently past due, this reporting is patently incorrect. In addition, this inaccurate reporting can also adversely affect credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Great Lakes' and OSU's reporting of currently past due payment statuses on transferred loans has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

121. The lack of investigation by both Great Lakes and OSU, as required by the FCRA, is unreasonable

**B.    Willful Violations**

122. Plaintiff further alleges that CAC, Great Lakes, and OSU have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and, as such, have developed reckless policies and procedures.

123. Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, CAC's, Great Lakes', and OSU's employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

124. Creditors like CAC, Great Lakes, and OSU commonly use credit reporting as a means of deemed "retribution" upon consumers who do not or cannot pay. Thus, Plaintiff alleges CAC's reporting as described herein is an attempt to have the most detrimental impact on her FICO Score, and, due to the factors and weights which comprise a FICO Score, is succeeding in doing so by its increased frequency and recency of derogatory charge off notations.

125. In the alternative, CAC, Great Lakes, and OSU were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

//

//

**C.   The CRA Defendants Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

126.   Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendants were required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the CAC, Great Lakes, and OSU accounts.

127.   Thus, the CRA Defendants each failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

128.   The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

129.   Plaintiff alleges the CRA Defendants are readily familiar with Metro 2 guidelines and credit reporting industry standards.

130.   Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

131.   The CRA Defendants can and do instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

132.   Equifax and TransUnion each failed to conduct a reasonable investigation because any basic investigation would have uncovered that the Great Lakes account and OSU account were not reporting correctly.

133.   Had Equifax and TransUnion each conducted a proper investigation, each could have closed or bookended the Great Lakes account and OSU account by adding a notation on their respective credit reports to show the debt was no longer past due as it is closed with a zero balance due to transfer.

134.   Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that CAC was not reporting the account at issue correctly.

135.   Had Experian conducted a proper investigation they could have removed the multiple, monthly repossessions on the CAC account.

136.   The CRA Defendants, therefore, did not conduct even the most basic investigations regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

137. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  The CRA Defendants Failed to Review and Consider all Relevant Information**

138. The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

139. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.  Willful Violations**

140. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

141. In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

142. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

143. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  The CRA Defendants Failed to Delete Disputed and Inaccurate Information**

144. The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

//

//

145. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

146. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

147. In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

148. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

1. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

   f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: January 8, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

                                                      **SCHUMACHER LANE PLLC**

Dated: January 8, 2021                        */s/ Kyle Schumacher*
                                                         Kyle Schumacher
                                                         Attorney for Plaintiff